# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DOROTHY BELL,           )
                            )
                            )
        Plaintiff,      )
    v.                   )
                            )      1:06CV649
BRANCH BANKING AND TRUST   )
COMPANY,                )
                            )
        Defendant.    )
                            )

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on a motion for summary judgment by Defendant Branch Banking and Trust Company. (docket no. 19). Plaintiff Dorothy Bell has responded to the motion. In this respect, the matter is ripe for disposition. Since there has been no consent, I must address the motion by way of a recommended disposition. For the following reasons, it will be recommended that the court grant Defendant's motion for summary judgment.

## BACKGROUND

Plaintiff Dorothy Bell was employed by Defendant Branch Banking and Trust Company ("BB&T" or the "Company") from July 29, 2001, to July 26, 2005, when her employment was terminated. Plaintiff was 56 years old at the time of her discharge. On July 28, 2006, Plaintiff filed this lawsuit against Defendant BB&T, alleging that her employment was terminated because of her age and for retaliation for internal

complaints about age-related bias in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 et seq. ("ADEA"). Plaintiff also alleges that she was wrongfully terminated based on her age in violation of North Carolina's Equal Employment Practices Act ("NCEEPA"), N.C. GEN. STAT. § 143-422 et seq., and North Carolina's Retaliatory Employment Discrimination Act ("REDA"), N.C. GEN. STAT. § 95-240 et seq., as well as the public policy stated in both statutes.

## FACTS

Plaintiff began working for BB&T as a teller on October 29, 2001, and was subsequently promoted to senior teller. (Pl.'s Dep. 34-35, 85-88.) Plaintiff describes her job performance as a teller as "very good." Defendant states that Plaintiff's job performance as a teller was "generally satisfactory," although she received periodic feedback on her performance reviews about the need to check her work, eliminate errors, and improve on her work quality, attention to detail, and accuracy. (Pl.'s Dep. 50-57, 66-71, 84-85, 212, 216-17, Exs. 2, 3, 5, 8, 27.) Plaintiff also received some formal discipline due to performance problems–*e.g.*, she was issued probation on August 8, 2002, and a written warning with probation on March 18, 2003. (*Id.* 57-65, 78-81, Exs. 4, 7.)

In August 2004, Plaintiff interviewed for promotion to an administrative assistant position in Defendant's Business Loan Administration ("BLA") department. (*Id.* 126-28, 133.) This position required the employee to handle incoming telephone

-2-

calls and provide administrative support to BLA personnel as needed (*e.g.*, faxing, copying, processing information and expense reports, making travel arrangements, ordering supplies, dictation/letters/memos). (*Id.* 130, 170-72, Ex. 18; Carter Aff. ¶ 4, Ex. B.) The position required use of Microsoft Word, Excel, and Outlook, and good verbal and written skills. (Pl.'s Dep. 170-71, Ex. 19; Carter Aff. ¶ 4, Ex. A.)

Credit Analysis Manager Paul Hoerig hired Plaintiff for the administrative assistant job. (Carter Aff. ¶ 4; Pl.'s Dep. 136-37.) Plaintiff began working in the BLA department on September 20, 2004. (Carter Aff. ¶ 5.) On September 27, 2004, Hoerig was promoted and was transferred out of state. (*Id.* ¶ 6.) In Hoerig's place, Lyrnn Carter was promoted to Credit Operations Manager in BLA, reporting to Profit and Risk Analysis Manager Ralph Banning. (*Id.* ¶ 1.) Additional responsibilities were added to the job Plaintiff initially accepted. Carter required administrative support, and Plaintiff was assigned to work as her administrative assistant beginning on October 1, 2004. (*Id.* ¶¶ 4, 8.) In addition to providing administrative support to Carter, Plaintiff continued to perform receptionist duties and handle overflow work assignments for other administrative assistants and BLA personnel. (*Id.*; Pl.'s Dep. 174-76.)

When Plaintiff began reporting to Carter, Carter learned that Plaintiff's previous manager had enrolled Plaintiff in an "Introduction to BB&T Systems" course offered by the Company's internal training department BB&T University on October 6 in South Carolina. (Carter Aff. ¶ 9.) Carter spoke with BB&T personnel, who told

her that the introductory course was intended for new hires or people who had been employed for less than a year and it was, therefore, not appropriate for Plaintiff. (*Id.*) Also, it was highly unusual for an administrative assistant to travel out-of-state and incur overnight lodging expenses for an internal training course. (*Id.*) For these reasons, Plaintiff was withdrawn from the course.

BB&T University personnel recommended that Plaintiff should take the Windows Skills Assessment, which was a prerequisite to further courses on Microsoft Office products such as Word, Outlook, and Excel. (*Id.* ¶ 10.) On October 1, 2004, Plaintiff completed and passed the Windows Skills Assessment. (*Id.*) Also in October 2004, Plaintiff met with Carter to discuss job-related objectives for inclusion in Plaintiff's Personal Development Plan and to discuss the mid-year and annual performance reviews. (Carter Aff. ¶ 11; Pl.'s Dep. 168-72, 225-26, Ex. 31.) At that time, Carter gave Plaintiff the pertinent job descriptions and discussed Plaintiff's training needs. (Carter Aff. ¶ 11, Exs. A, B; Pl.'s Dep. 170-71, Exs. 18-19.)

According to Defendant, soon after Plaintiff began reporting to Carter, it became apparent to Carter that Plaintiff lacked basic skills necessary for the administrative assistant position and that Plaintiff needed immediate, additional training. (Carter Aff. ¶ 12.) Defendant asserts that Plaintiff lacked the most basic knowledge of Microsoft Word, Excel, and Outlook, and she also lacked fundamental administrative skills. (*Id.*; Pl.'s Dep. 203-10.) For example, Plaintiff used her computer keyboard like a typewriter, hitting the "Enter" key to make hard returns

-4-

instead of allowing the text to wrap from line to line. (Carter Aff. ¶ 12; Pl.'s Dep. 229-30.) At one point, Plaintiff asked Carter for permission to use a typewriter instead of a computer to complete her work assignments. (Carter Aff. ¶ 12.) Plaintiff also had difficulty performing clerical tasks such as making copies and keeping them organized. (*Id.*; Pl.'s Dep. 206-07, 230.) Defendant further asserts that Plaintiff frequently did not follow basic instructions and that she rarely took notes about assignments she was given. (Carter Aff. ¶ 12.)

When Carter determined that Plaintiff lacked the required skills to perform her job, Carter began looking into available training resources. Carter contacted local colleges to see if they offered an executive class, but she was told that no such course was available. (*Id.* ¶ 13.) Carter also looked into available courses for Plaintiff at BB&T University. (*Id.* ¶ 14.) BB&T University personnel informed Carter that due to the Company's ongoing upgrade to new software products, further training courses on Word and Excel would not be available until the new training was rolled out in the next year. (*Id.*) Carter arranged, however, for Plaintiff to take several other courses through BB&T University. In addition to the "Windows Skills Assessment," Plaintiff completed "Information Security Awareness" in November 2004, "Managing Outlook" in January 2005, and "Effective English for Business Writing" in April 2005. (*Id.* ¶ 15.) After it became apparent that Plaintiff lacked basic computer skills, Carter also decided to re-enroll Plaintiff in "Introduction to BB&T Systems" in February 2005. Plaintiff cancelled due to illness and took the course the next time it was offered in March 2005. (Carter Aff. ¶ 15.)

On December 7, 2004, Plaintiff's performance review for the review year of October 2003 to October 2004 was conducted. (Carter Aff. ¶ 16, Ex. D; Pl.'s Dep. 212-19, Ex. 27.) Plaintiff's previous manager completed a portion of the review for Plaintiff's work as a teller, and Carter entered her comments on the Personal Development Plan for the upcoming review year. (Carter Aff. ¶ 16, Ex. D.) In this review, Carter stated that Plaintiff had a lot to learn in her new role because the office atmosphere and expectations were different from the day-to-day branching network environment in which Plaintiff had worked as a teller. (*Id.*) Plaintiff testified that she agreed with this statement. (Pl.'s Dep. 218.)

As they went over Plaintiff's performance review on December 7, 2004, Carter and Plaintiff discussed the need for Plaintiff to receive training on "Basic 101" administrative skills, including office clerical skills and computer skills. (Carter Aff. ¶ 17.) Upon Carter's recommendation, Plaintiff purchased approximately $100 worth of books on Microsoft Office products, and BB&T reimbursed Plaintiff for the expense. (*Id.*; Pl.'s Dep. 192-93.) On December 9, 2004, Carter arranged for BB&T University Senior Technology Facilitator Carol Dorsett to provide individualized, one-on-one training to Plaintiff on Microsoft Word, Excel, and Outlook. (Carter Aff. ¶ 18, Ex. E; Pl.'s Dep. 189-90, Exs. 21-22.) Dorsett conducted this training at BB&T University on December 20, 21, and 22, for a total of more than ten hours. (Carter Aff. ¶ 19; Pl.'s Dep. 195-201, Exs. 23-24.) The type of individualized training that Plaintiff received from Dorsett was unusual and was only available upon request. (Carter Aff. ¶ 20.)

-6-

According to Defendant, in early 2005, Plaintiff's job performance did not improve, and she continued to make errors on basic administrative tasks. (Carter Aff. ¶ 21.) For example, on January 31, 2005, Carter asked Plaintiff to make several sets of copies. (*Id.* ¶ 22.) When Plaintiff delivered the copies, Carter noticed that one set was different from the others. (*Id.*) Carter asked Plaintiff if the documents had gotten out of order and Plaintiff replied that they had not. When Carter went to the copy machine, three original pages of the documents that Plaintiff had been asked to copy were jammed in the machine, which was displaying error messages. (*Id.*) Carter fixed the problem, made new sets of copies, and told Plaintiff what she had done.

Defendant further states that in March 2005 Carter noticed that some of Plaintiff's internal e-mails were not professionally prepared and contained spelling errors that should have been avoided through the use of Spellcheck. (Carter Aff. ¶ 23, Ex. F; Pl.'s Dep. 223-25, Ex. 30.) Carter spoke with Plaintiff about professionalism in written communications and reviewed BB&T's policy and standards regarding the "Professional Use of E-mail." (*Id.*) Carter also gave Plaintiff a "dummy" letter to prepare in order to practice her written communication skills. (*Id.*) While Plaintiff was working on the "dummy" letter, Carter noticed that successive drafts of the letter contained changes that had been made without Carter's approval. (Carter Aff. ¶ 24, Ex. G.) In discussing this issue with Plaintiff, Carter discovered that Plaintiff did not know how to save documents in the computer

system and that she had retyped each draft from scratch.  (*Id.*)  Carter then arranged for Plaintiff to receive brief training on how to properly save documents.  (*Id.*)

Plaintiff's six-month review was due to be conducted in April 2005, and Carter knew she would be giving Plaintiff a negative assessment on several critical performance criteria.  (*Id.* ¶ 26.)  Therefore, Carter contacted Regional Employee Relations Manager Natasha Goddard in early April 2005 for guidance on addressing Plaintiff's performance deficiencies.  (*Id.*)  After conferring with Goddard, Carter decided to place Plaintiff on a 90-day performance improvement plan ("PIP") at the time of her six-month review in April.  (*Id.* ¶ 27.)  In addition, Carter obtained permission from her supervisor Banning to have his administrative assistant Abi Boyd ("Boyd") provide hands-on training and mentoring to Plaintiff while the PIP was in place.  (*Id.* ¶ 28.)

On April 20, 2005, Banning and Carter gave Plaintiff her six-month performance review and placed her on the 90-day PIP.  (Carter Aff. ¶ 29; Pl.'s Dep. 225-27, Exs. 31, 32.)  The letter explaining the 90-day PIP states, among other things:

> Due to the fact that certain aspects of your individual performance fall short of expectations set forth in your [Personal Development Plan], and those set forth by management, it has become necessary to document, in writing, a 90-Day Performance Improvement Plan.  It is imperative that you correct all substandard areas of your performance immediately and continue on an ongoing basis to maintain an acceptable level of performance.

(Ex. J to Carter Aff.)  The letter further states that Carter and Plaintiff would meet periodically during the next 90 days to review Plaintiff's progress and that "[i]f your

performance is not at the expected level during this 90 day period, I will reevaluate your continuance in the Administrative Assistant position. This may include transitioning you to a lesser administrative function or other position more suited to your strengths or additional disciplinary action up to and including termination." (*Id.*)

During the meeting regarding the PIP, Carter asked if Plaintiff would be interested in returning to a teller job, and Plaintiff stated that she would not. (Carter Aff. ¶ 31; Pl.'s Dep. 264.) In the written six-month review, Carter stated that Plaintiff lacked the necessary skills to perform her job duties and described the types of performance problems Plaintiff had been having. (Carter Aff. ¶ 29, Ex. I.) The PIP, which was attached to the six-month review, stated that Plaintiff needed to improve in the areas of written and oral communication, work quality, and problem solving. (*Id.* ¶ 30, Ex. J.) The PIP further stated that Plaintiff would be paired with Boyd for mentoring and hands-on training regarding basic administrative skills. (*Id.*) During the April 20 meeting, Carter instructed Plaintiff to contact Boyd right away to begin the training. (*Id.*) Plaintiff testified in her deposition that she appreciated the opportunity to train with Boyd and viewed this as a positive development. (Pl.'s Dep. 236-37.) Defendant contends that this was, in fact, an extraordinary step taken by Carter in an effort to help Plaintiff succeed in her job. (Carter Aff. ¶ 28.) To Carter's knowledge, no other administrative assistant at BB&T had received such extensive, one-on-one coaching in order to learn basic administrative skills. (*Id.*)

On April 22, 2005, Plaintiff contacted Regional Employee Relations Manager Goddard to tell her that Carter had complained about Plaintiff's age on five prior

occasions. (Goddard Aff. ¶ 8.) According to Plaintiff, Carter had also told Plaintiff on various occasions that "you're worthless to me" and "you cannot be trusted." Plaintiff also reported that Carter had once stated to Plaintiff that if it were her decision to make she never would have hired Plaintiff because of Plaintiff's lack of computer skills. (*Id.*) Goddard asked Plaintiff about the job performance problems that led to her PIP. (Goddard Aff. ¶ 9.) Plaintiff admitted that she had been having performance problems, including using the computer keyboard incorrectly and failing to properly complete copying assignments. (*Id.*) Goddard asked Plaintiff about her on-the-job training with Boyd and Plaintiff stated that she had not followed up with Boyd. (*Id.*) Plaintiff also told Goddard that she had not spoken with Carter or Carter's supervisor Banning about her concerns. (*Id.* ¶ 10.) Goddard advised Plaintiff to follow-up directly with Carter or Banning about the age discrimination issues she had raised. (*Id.*) Goddard added that Plaintiff should focus on addressing her job performance. (*Id.*) Finally, Goddard asked Plaintiff if she would be interested in returning to a teller position. (*Id.* ¶ 11.) Plaintiff stated that she would not consider a teller job because it would be a step back in her career. (*Id.*)

On May 2, 2005, Plaintiff delivered to Carter a letter dated May 1, 2005, stating that she felt she needed further training in order to perform her job properly. (Carter Aff. ¶ 32, Ex. K; Pl.'s Dep. 238-40, Ex. 33.) Plaintiff stated that without this training she was at a "huge disadvantage, both professionally and personally." (*Id.*) Plaintiff's letter further stated that it was "difficult and frustrating" for her to hear that her job performance was not satisfactory. (*Id.*) Plaintiff's letter also stated:

I do . . . feel that it is inappropriate for you to reference my age when discussing my work abilities. Within a 6 month period of time, you have 5 times used phrases such as "*at this stage of your life*," "*at your age*," and "*because of where you are now in life*" and this has made me feel rather uncomfortable. I do not understand why you imply my age is a factor here, as it has never before kept me from performing well and it never will.

(Carter Aff. ¶ 32, Ex. K (emphasis in original).) Finally, Plaintiff asked in this letter if she could be transferred to another position within BB&T that would be a better fit for her skills. (*Id.*)

Carter faxed Plaintiff's letter to Goddard. On May 3, 2005, Goddard and Carter discussed the age-related comments that Plaintiff had attributed to Carter. (*Id.* ¶ 34; Goddard Aff. ¶¶ 13, 15, Ex. C.) Carter told Goddard that the only time she had mentioned Plaintiff's age was in the context of retirement planning. (Carter Aff. ¶ 36; Goddard Aff. ¶ 16; Pl.'s Dep. 257-59.) Goddard asked whether Carter had referred to Plaintiff changing positions at "this time in your life" or "at this stage of your life" or "at your age." (Carter Aff. ¶ 37; Goddard Aff. ¶ 17.) Carter stated that she had told Plaintiff that changing careers at this time in her life–*e.g.*, after Plaintiff had been out of an office environment for so long–into a new role that required new skills that she did not possess might be difficult for her, and that this transition might be easier for someone who was just getting out of college because they would be trained on computer skills or for someone who had recently been an administrative assistant in another office environment. Carter told Goddard that she did not believe that Plaintiff's performance deficiencies or lack of administrative skills were related

-11-

to her age.  (*Id.*)  In fact, Carter noted that she herself had gone back to college and completed her four-year degree at the age of 40.  (*Id.*)

Goddard told Carter that her communication style as reported by Plaintiff was problematic, and that in the future, Carter needed to be sure she did not make any references to age.  (Carter Aff. ¶ 38; Goddard Aff. ¶ 18.)  Goddard also told Carter that she and Plaintiff had recently discussed the PIP as well as the age references that Plaintiff had attributed to Carter.  (Carter Aff. ¶ 38.)  Goddard informed Carter that, at that point, Plaintiff had not followed up with Boyd about the training.  (*Id.*)  Goddard further stated that Plaintiff did not seem to understand the magnitude of her performance problems or how important it was that she learn the required skills or improve her job performance.  (Goddard Aff. ¶ 19.)

Banning and Carter subsequently met with Plaintiff on May 9, 2005, and gave her a memo specifically describing performance problems since she had been working in BLA.  (Carter Aff. ¶¶ 39-40, Ex. L.)  Plaintiff acknowledged only simple mistakes, which she attributed to stress.  (*Id.*)  Plaintiff also said that she had not contacted Boyd about training.  (*Id.*)  Carter directed Plaintiff to set up a time with Boyd for on-the-job training.  (*Id.*)  Also on May 9, Carter solicited feedback about Plaintiff's work from other BLA personnel.  (*Id.* ¶¶ 44-45, Exs. M-N.)  Those who were familiar with Plaintiff's work indicated that Plaintiff's job skills were limited.  (*Id.*)

During the May 9 meeting, Plaintiff sought a transfer within BB&T.  (*Id.* ¶ 42.)  Ordinarily, Plaintiff would not be permitted to request a transfer until she had

-12-

occupied her position for at least a year. (*Id.*) Moreover, BB&T typically does not allow employees to transfer when they have been issued corrective action, such as Plaintiff's PIP. (*Id.*) Due to Plaintiff's previous success in the teller position, however, and because of her lack of the skills needed to succeed in the administrative role, Carter made an exception to the general policies and approved Plaintiff's request for transfer. (*Id.*) Carter instructed Plaintiff to prepare a request for transfer form and submit it for approval. (*Id.*) In the meantime, Banning and Carter stressed that even though her request for transfer would be approved, Plaintiff was still under a PIP and that she was still responsible for improving her job performance. (*Id.*)

Plaintiff completed a request for transfer form on May 11, 2005. (Pl.'s Dep. 286-94, Ex 37.) In contrast to her first request for transfer form completed a year previously, Plaintiff stated that the special skills and/or experience that she possessed that would be helpful included typing 60 words per minute, data entry, 10-key calculator, leadership, and computer software. As for computer software, Plaintiff noted that she was "[p]resently learning Word and Excel to further my abilities." Plaintiff testified that this 2005 request transfer form contained a more accurate description of her computer skills than the request for transfer form she completed in 2004. (Pl.'s Dep. 291.)

Plaintiff's request for transfer form was approved and submitted to BB&T Employment Consultant Susan Strickland in May 2005. (Carter Aff. ¶ 49.)

-13-

Strickland told Plaintiff that most of the available local jobs required computer proficiency, which Plaintiff lacked. (Pl.'s Dep. 315.) Strickland instructed Plaintiff to post her employee profile on the BB&T intranet so that it could be attached to the postings for any suitable job positions that might become available. (*Id.* 308, 313.) Plaintiff did not post her employee profile until July 7, 2005, purportedly because she had difficulty assessing the Company intranet. (*Id.* 318-19, Ex. 42.) Even then, she did not post via the intranet, but she instead accessed BB&T's external job postings on-line. (*Id.*) At that time, Plaintiff told Strickland that she had applied on-line for a benefits position in the benefits department at BB&T. (Pl.'s Dep. 320-21, Ex. 43.) This job, however, required computer literacy with word processing spreadsheet programs, along with other skills that Plaintiff did not have. (Goddard Aff. ¶ 24, Ex. G.)

On May 10, 2005, Banning, Carter, and Boyd met with Plaintiff to discuss the plan for Plaintiff's on-the-job training. (Carter Aff. ¶ 46.) At that time, it was determined that Boyd would meet with Plaintiff for 30 to 45 minutes each morning. (*Id.*) Carter asked Boyd to report periodically on how the training was proceeding. (*Id.*) Also on May 10, Plaintiff gave Carter a memo responding to job complaints raised by Carter in a memo dated May 9, 2005. (*Id.* ¶ 47, Ex. O; Pl.'s Dep. 271-72, Ex. 36.) In Plaintiff's memo, Plaintiff explained that she was troubled by Carter's age-discriminatory comments. (*Id.*)

-14-

Over the next two-and-a-half months, Boyd worked with Plaintiff on basic computer skills, such as how to properly save documents so they would not be lost and how to perform a "mail merge," etc. (Carter Aff. ¶ 50, 55-56, Exs. V, W; Pl.'s Dep. 303-06.) Boyd also provided guidance on basic administrative matters such as taking notes about work assignments, immediately saving new documents, reviewing originals before making copies, typing without "hard returns," and printing hard copies of documents to proofread. (*Id.*) Boyd gave Plaintiff a Gregg Reference Manual for guidance on how to properly format documents. (Pl.'s Dep. 302.)

On May 23, 2005, Banning and Carter met with Plaintiff to discuss her training and job performance under the PIP. (Carter Aff. ¶ 51, Ex. T; Pl.'s Dep. 294-95, Ex. 39.) Carter gave Plaintiff a list of basic pointers that Carter had prepared. (Carter Aff. ¶ 51, Ex. S; Pl.'s Dep. 294, Ex. 38.) Carter also gave Plaintiff a leather BB&T portfolio that Carter had purchased for her and stressed that Plaintiff must start taking notes about her job assignments and what she learned in training. (Carter Aff. ¶ 51; Pl.'s Dep. 301-02.) During the meeting, Plaintiff stated that she was enjoying her training with Boyd. (Carter Aff. ¶ 51.) In her deposition, Plaintiff testified that Boyd did a good job with the training. (Pl.'s Dep. 269.)

According to Defendant, despite the in-depth training and counseling that was provided to her, Plaintiff continued to make basic errors. For example, in July 2005, Carter asked Plaintiff to prepare a simple "dummy" letter to seven different recipients so she could practice the "mail merge" function that Boyd had taught her. (Carter

-15-

Aff. ¶ 52-53.) Plaintiff made numerous errors in completing the letters. Initially, her only explanation for the errors was that the documents were correct on her computer screen before she printed them. (*Id.*) After Boyd pointed out that Plaintiff had not used the "mail merge" function but had individually typed each letter, Plaintiff admitted this was true. (*Id.*)

In mid-July 2005, after the "mail-merge" incident, Boyd told Carter that she was extremely frustrated with Plaintiff's lack of improvement. (*Id.* ¶¶ 54, 56, Ex. W.) Boyd stated that she had been working with Plaintiff on the same performance issues for more than two months and Plaintiff was still not catching on. (*Id.*) Boyd said that Plaintiff continued to make the same mistakes–*e.g.*, not writing things down, not following instructions, not saving documents properly, not using Spellcheck, and not proofreading her work. (*Id.*) Boyd stated that she believed Plaintiff was not sincerely trying to learn her job duties and Plaintiff seemed to have become resistant to training. (*Id.*)

In mid-July 2005, Carter determined that Plaintiff had not made the necessary improvements during the 90-day PIP and had not demonstrated that she possessed the required skills to perform successfully as an administrative assistant. (*Id.* ¶ 57.) According to Defendant, Carter decided to terminate Plaintiff's employment based on unsatisfactory job performance. (*Id.*; Goddard Aff. ¶ 21.) On July 21, 2005, Banning, Carter, and Goddard informed Plaintiff that her employment at BB&T was terminated for nonperformance. (Carter Aff. ¶ 58, Ex. X; Goddard Aff. ¶ 22, Ex. 5;

Pl.'s Dep. 324-26.)  In her deposition, Plaintiff testified that she believes she was terminated because of her age and because she could not do her job.  (Pl.'s Dep. 375-77.)  Plaintiff admitted in her deposition that she could not in fact perform her job duties, but she attributes this to lack of training.  (*Id.*)  In addition, Plaintiff testified that she believed her complaint to Defendant's human resources department about Carter's age-related comments might have factored into the discharge decision.  (*Id.* 377-78.)

While Plaintiff worked in BLA, BB&T had in place written policies prohibiting discrimination and harassment based on age.   (Goddard Aff. ¶ 25, Exs. I-M.)  BB&T's policies also prohibited retaliation against employees who complain about age-related discrimination or harassment.  (Pl.'s Dep. 72-75, 97-98, Exs. 12, 28.)

## STANDARD OF REVIEW

Summary judgment is appropriate when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); *Zahodnick v. International Bus. Machs. Corp.*, 135 F.3d 911, 913 (4th Cir. 1997).  The party seeking summary judgment bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the non-moving party must then affirmatively demonstrate that there is a genuine issue of material fact which requires trial.  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  There is no issue for trial unless

there is sufficient evidence favoring the non-moving party for a fact-finder to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995). Thus, the moving party can bear his burden either by presenting affirmative evidence or by demonstrating that the non-moving party's evidence is insufficient to establish his claim. *Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting). When making the summary judgment determination the court must view the evidence, and all justifiable inferences from the evidence, in the light most favorable to the non-moving party. *Zahodnick*, 135 F.3d at 913; *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir. 1997).

## DISCUSSION

I first address Plaintiff's claim for age discrimination under the ADEA. *See* 29 U.S.C. § 623(a). To satisfy ordinary principles of proof in discrimination cases, a plaintiff must provide direct evidence of a purpose to discriminate or circumstantial evidence of sufficiently probative force to raise a genuine issue of material fact. *Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988). Because it is often difficult for a plaintiff to provide direct evidence of discriminatory intent, the Supreme Court has created a burden-shifting structure for analyzing such claims. *See McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under this burden-shifting structure, known as the "McDonnell Douglas" framework, the plaintiff must plead facts sufficient to create an inference that an adverse employment decision was

-18-

based on impermissible considerations. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (assuming that the McDonnell Douglas framework was "fully applicable" in both Title VII and ADEA actions).

To establish a prima facie case of age discrimination under the pretext framework, Plaintiff must show that (1) she is a member of the protected class[1]; (2) when she was terminated, she was qualified for the job and performing at a level that met BB&T's legitimate expectations; (3) she was discharged despite her qualifications and performance; and (4) following her discharge, she was replaced by a substantially younger employee with comparable qualifications. *Martin v. Patrick Indus. Inc.*, 478 F. Supp. 2d 855, 859 (M.D.N.C. 2007); *Rishel v. Nationwide Mut. Ins. Co.,* 297 F. Supp. 2d 854, 869 (M.D.N.C. 2003).

Once a plaintiff establishes a prima facie case, the burden then shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for the challenged action; however, this burden "is one of production, not persuasion." *Reeves*, 530 U.S. at 142. If the employer demonstrates a legitimate, nondiscriminatory reason, the presumption of unlawful discrimination created by the prima facie case "drops out of the picture," and the burden shifts back to the employee to show that the given reason was merely a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993); *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55,

---

[1] For ADEA purposes, the protected class is comprised of individuals who are at least 40 years of age. *See* 29 U.S.C. § 631(a).

-19-

57-58 (4th Cir. 1995). The responsibility of proving that "the protected trait . . . actually motivated the employer's decision" remains with the plaintiff at all times. *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Thus, it is not enough for a plaintiff merely to raise an inference of discrimination. Rather, a plaintiff bears the ultimate burden of proving that the decision was made not on any proffered grounds but instead on the basis of impermissible discriminatory grounds. *Reeves*, 530 U.S. at 143. To overcome a motion for summary judgment in such a case, a plaintiff must provide direct or circumstantial evidence "of sufficient probative force" to show a genuine issue of material fact exists as to this question. *Goldberg*, 836 F.2d at 848. With these principles in mind, the court now turns to Plaintiff's age discrimination claim.

Plaintiff cannot make out a prima facie case of age discrimination. First, she cannot demonstrate that she was qualified for the administrative job or that she was meeting BB&T's job-related expectations when she was discharged. Indeed, Plaintiff was on a PIP for performance deficiencies for the last 90 days of her employment and she has admitted that she did not satisfy the basic job requirements for the administrative assistant role. (Pl.'s Dep. 243, 375-77.) Furthermore, Plaintiff has not identified a similarly situated younger employee who was treated more favorably than she was treated. Thus, she has failed to establish two required elements of her prima facie case. In opposition to summary judgment, Plaintiff categorizes her performance problems as nothing more than a reflection of Carter's

"minor or minimal gripes." (Pl.'s Br. 10.) Plaintiff admitted in her deposition, however, that she was not qualified for the administrative assistant role and she failed to properly perform her duties. It is well settled that it is the perception of the decision-maker, and not Plaintiff's perception, that is relevant in determining whether Plaintiff can show that she was meeting BB&T's job-related expectations. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996); *Jones v. Southcorr, LLC*, 324 F. Supp. 2d 765, 781 (M.D.N.C. 2004). Since Plaintiff has failed to establish a prima facie case for age discrimination, it will be recommended that the court grant summary judgment in favor of Defendant as to Plaintiff's claim for age discrimination under the ADEA.

Nor can Plaintiff proceed under a mixed-motive analysis. Plaintiff stated in her deposition that she believed that Defendant fired her because of her age *and* because she was not performing her work according to Defendant's expectations. Thus, she appears to be asserting a mixed-motive theory of discrimination. Under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), a plaintiff need not demonstrate that her age was the *sole* motivating factor to prevail, as long as it was *a* motivating factor. *EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 164 (4th Cir. 2004). In other words, it is sufficient for Plaintiff to demonstrate that BB&T was motivated to terminate her employment by both permissible and forbidden reasons. *Id.* If Plaintiff makes this initial showing, Defendant "can nonetheless avoid liability by proving that it would have terminated

-21-

[Plaintiff] even in the absence of a discriminatory motive." *Id.* (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989)). Application of the mixed-motive analysis requires "at most, evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.* at 163.

With the passage of the Civil Rights Act of 1991, Congress altered the mixed-motive analysis with regard to claims brought under Title VII. That is, the Civil Rights Act provides, among other things, that an unlawful employment practice is established "when the complaining party demonstrates that . . . sex . . . was a motivating factor for any employment practice, even though other factors also motivated the practice," 42 U.S.C. § 2000e-2(m). If an individual proves a violation of section 2000e-2(m), the employer can avail itself of a limited affirmative defense that restricts the available remedies if it demonstrates that it would have taken the same action absent the impermissible motivating factor, 42 U.S.C. § 2000e-5(g)(2)(B). Congress did not, however, similarly amend the ADEA. Thus, the Fourth Circuit has ruled that mixed-motive cases under the ADEA remain subject to the *Price Waterhouse* analysis and employers may avoid liability altogether upon proof that the plaintiff's employment would have been terminated even absent discriminatory bias. *Baqir v. Principi*, 434 F.3d 733, 745 n.13 (4th Cir. 2006); *see also Bowen-Hayes v. Troxler Elec. Labs., Inc.*, No. 1:05cv379, 2007 WL 1101226, at *9 n.3 (M.D.N.C. Apr. 11, 2007). The Fourth Circuit has also held that evidence of a plaintiff's inability to perform her job duties at a level that met the employer's

legitimate expectations is sufficient to meet this burden. *Baqir*, 434 F.3d at 745.

BB&T has sufficiently shown that it discharged Plaintiff for a reason wholly unrelated

to her age–specifically, Plaintiff's admitted job performance deficiencies. Thus, even

assuming that Plaintiff could show that Defendant's decision was motivated in part

by age, which she cannot, Plaintiff still could not proceed with her age discrimination

claim under a mixed-motive analysis.

<u>Plaintiff's NCEEPA Claim</u>

Plaintiff also claims age discrimination in violation of North Carolina's Equal

Employment Practices Act ("NCEEPA") which states that employment discrimination

based on age is contrary to the public policy of North Carolina. N.C. GEN. STAT. §

143-422.2. The NCEEPA, however, does not provide a private cause of action for

employment discrimination. *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th

Cir. 2000) (no private right of action under NCEEPA for sexual harassment).

Instead, "most courts have applied the NCEEPA only to common law wrongful

discharge claims or in connection with other specific statutory remedies." *Id*.

Plaintiff's complaint, however, purportedly sets forth a wrongful discharge claim

based on the public policy under REDA only, not the NCEEPA. (Compl. ¶ 27.)

Therefore, Plaintiff has not properly asserted a claim for wrongful discharge against

public policy under the NCEEPA. Even if the court liberally construes Plaintiff's

complaint as stating a claim for wrongful discharge against public policy set forth in

the NCEEPA, any such claim must be analyzed under the same standards as the

ADEA. *Rishel,* 297 F. Supp. 2d at 875. For the same reasons that Plaintiff cannot

overcome Defendant's summary judgment motion as to her ADEA claim, her NCEEPA claim also fails.

Plaintiff's Claim for Retaliation under REDA, EEPA, and the ADEA

Plaintiff has also brought a claim for retaliation based on her complaints to Defendant that she believed that Carter was discriminating against her based on her age. The North Carolina Retaliatory Employment Discrimination Act ("REDA") prohibits employment discrimination against individuals who engage in certain specified activities, including exercising their rights under the North Carolina Workers Compensation Act, the North Carolina Wage and Hour Act, or the North Carolina Occupational Safety and Health Act. *See* N.C. GEN. STAT. §§ 95-241 to -243. Plaintiff has neither alleged nor demonstrated that she engaged in any conduct that might constitute protected activity under REDA, which does not cover internal complaints of age discrimination. Nor has Plaintiff asserted that she has satisfied the statutory prerequisites to suit, such as filing a claim with the North Carolina Department of Labor. *See Brackett v. SGL Carbon Corp.*, 158 N.C. App. 252, 256, 580 S.E.2d 757, 760 (2003). For all these reasons, Defendant is entitled to summary judgment as to Plaintiff's retaliation claim brought under REDA.

As for Plaintiff's argument in her brief that she has a retaliation claim under the NCEEPA, she did not allege a retaliation claim under NCEEPA in her complaint. *See* N.C. GEN. STAT. § 143-422.1. She asserts a NCEEPA retaliation claim for the first time in her response brief, arguing that she is pursuing a retaliation claim based on the NCEEPA's public policy against age discrimination. Even if the court were

-24-

to read Plaintiff's complaint to include a retaliation claim based on the NCEEPA, this court has repeatedly held that the NCEEPA does not cover claims for retaliation. *See, e.g., Efird v. Riley*, 342 F. Supp. 2d 413, 428-29 n.7 (M.D.N.C. 2004); *Barbier v. Durham County Bd. of Educ.*, 225 F. Supp. 2d 617, 628 (M.D.N.C. 2002)*; Stout v. Kimberly Clark Corp.*, 201 F. Supp. 2d 593, 607 (M.D.N.C. 2002)*; Mullis v. Mechanics & Farmers Bank,* 994 F. Supp. 680*,* 687 n.5 (M.D.N.C. 1997). Thus, both of Plaintiff's state law retaliation claims should be dismissed.

Finally, as for Plaintiff's retaliation claim under the ADEA, she has failed to bring a prima facie case for retaliation under the ADEA. The ADEA prohibits employers from retaliating against employees for opposing any practice made unlawful under the statute. *See* 29 U.S.C. § 623(d). A plaintiff who lacks direct evidence of retaliation may use the *McDonnell Douglas* framework to establish a retaliation claim. *Newby v. Whitman*, 340 F. Supp. 2d 637, 660 (M.D.N.C. 2004) (citing *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004)). To make out a prima facie case of retaliation, Plaintiff must show that: (1) she engaged in protected activity; (2) she suffered a materially adverse action–that is, an action which well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination"; and (3) a causal connection existed between the protected activity and the materially adverse action. *Burlington Northern & Sante Fe Railway Co. v. White*, 126 S. Ct. 2405, 2415 (2006). Once a prima facie case has been presented, BB&T has the burden of producing a legitimate, non-discriminatory reason for the adverse action, and Plaintiff must then show that BB&T's proffered reason is pretextual. *Id.*

Assuming that Plaintiff's complaints to Goddard about Carter's remarks regarding her age constitute protected activity, Bell still cannot establish a causal connection between her complaints and her termination; thus, she has failed to prove a prima facie case for retaliation.[2] Plaintiff did not complain about age-related comments until after she was placed on a PIP and well after Carter had already informed her that she was not meeting Defendant's work-related expectations.[3] (Pl.'s Dep. 245-46.) While Plaintiff was on PIP, BB&T engaged in prolonged efforts to help Bell improve her administrative skills. When her skills had not improved at the end of the PIP period, BB&T terminated her employment due to unsatisfactory performance. Indeed, the 11-week lag between the time that Carter learned of the internal complaint and Plaintiff's termination suggests that the motive was not retaliatory, particularly since Plaintiff was placed on a PIP for unsatisfactory performance before she engaged in any conduct that could be construed as protected activity. *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (stating

---

[2] Moreover, even if Plaintiff were able establish a prima facie case of retaliation, BB&T has offered a legitimate, non-discriminatory reason for its discharge decision–Plaintiff's admittedly unsatisfactory job performance. For the reasons already noted, Bell cannot show that this reason was pretextual. Thus, the court should grant summary judgment to Defendant on Plaintiff's retaliation claim.

[3] In attempting to show causation, Plaintiff asserts that Defendant did not assign Boyd as a job coach until after Plaintiff complained to Goddard about Carter's age-related comments. As Defendant notes, this assertion is factually incorrect, as the record shows that BB&T placed Plaintiff on PIP and assigned her to Boyd for training *before* she complained about the remarks made by Carter about Plaintiff's age. Thus, Plaintiff has not established an inference of causation between her complaints about Carter's remarks and Defendant's termination of her employment for inadequate job performance. The same is true for her allegation that her complaints caused BB&T to retaliate against her by "specially watch[ing] and scrutiniz[ing] her." (*See* Compl. ¶ 17.)

that ten weeks between notice of filing of an EEO complaint and termination of employment was sufficiently long to weaken significantly the inference of causation); *Horne v. Reznick Fedder & Silverman*, 154 Fed. Appx. 361, 364 (4th Cir. 2005) (unpublished) (stating that a two-month interval was too long to substantiate a retaliation claim, particularly where the plaintiff was previously warned about poor job performance). I further note that in opposition to the summary judgment motion, Plaintiff has not presented any argument in support of her retaliation claim under the ADEA; thus, she had arguably waived her retaliation claim for failure to prosecute it on summary judgment.

**CONCLUSION**

For the reasons stated herein, it is **RECOMMENDED** that the court **GRANT** Defendant's motion for summary judgment (docket no. 19) and dismiss Plaintiff's action in its entirety.[4]

WALLACE W. DIXON
United States Magistrate Judge

July 16, 2007

---

[4] The court notes that Defendant has requested attorney's fees as part of its costs in defending this action. The ADEA does not expressly provide attorney's fees to a prevailing defendant. Under the American rule, each party is generally required to bear the costs of their own attorney's fees, absent explicit Congressional authorization to the contrary. Courts have awarded attorney's fees to prevailing defendants under an exception to the American rule, which allows a prevailing defendant to be awarded attorney's fees if is shown that the plaintiff's action was frivolous, unreasonable, or without foundation. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978). I do not find that Plaintiff's action was frivolous, unreasonable, or without foundation; thus, Defendant should not be awarded attorney's fees. *See generally Colbert v. Yadkin Valley Tel. Membership Corp.*, 960 F. Supp. 84 (M.D.N.C. 1997).